UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROBERT SCOTT,

Petitioner,

v.

SUPERINTENDANT, MCI SHIRLEY,

Respondent,

No. 15-CV-10826-PBS

**REPORT AND RECOMMENDATION REGARDING PETITION UNDER
28 U.S.C. § 2254 WRIT OF HABEAS CORPUS (Dkt. No. 1),
AND RENEWED MOTION TO AMEND HABEAS PETITION (Dkt. No. 37)**

February 7, 2017

CABELL, U.S.M.J.

### I. INTRODUCTION

The petitioner, Robert Scott, now known as Sultan Chezulu ("Scott" or "the petitioner"), is serving a life sentence following his state court conviction for first degree murder. Pending before the Court are two matters, Scott's petition for a writ of habeas corpus under 28 U.S.C. § 2254 (Dkt. No. 1), and his motion to amend the habeas petition. (Dkt. No. 37). The respondent opposes both requests. (Dkt. No. 47). After careful consideration of the record, and for the reasons set forth below, I recommend that the motion to amend the petition be granted, but that the petition (as amended) be denied.

## II. FACTS

### A. The Underlying Crime

As described by the Massachusetts Supreme Judicial Court
(SJC), the jury could have found the following facts[1]:

> In December, 1984, the victim's body was
> found by a passerby in a vacant lot in
> Boston. [The victim, Yolanda Hernandes,]
> was eighteen years old. An autopsy revealed
> that the victim had suffered multiple blunt
> impact injuries to her head, fractures to
> her skull, lacerations and contusions to her
> face, and fractured and loosened teeth. A
> sock had been tied as a ligature around the
> victim's neck. She had been alive when her
> injuries were inflicted.
>
> Although the victim was identified, the case
> remained unsolved for many years. After
> being contacted by the victim's sister in
> 2006, the Boston police department reopened
> the case. Police reexamined evidence
> collected in the original investigation,
> including the victim's clothing and vaginal
> and anal swabs taken from her body at the
> autopsy.
>
> The vaginal and anal swabs, as well as a
> stain from the victim's skirt, were found to
> contain sperm cells. DNA testing was
> performed on those cells, and the DNA
> pattern found in the cells was run through a
> national database. The database returned a
> match with the defendant's DNA. The
> likelihood that the DNA pattern shared by

---

[1] In habeas proceedings filed by a prisoner in state custody, "a determination of factual issues by the State court should be presumed to be correct." 28 U.S.C. § 2254(e)(1). The petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.* This presumption of correctness extends to factual findings by state appellate courts. *Rashad v. Walsh*, 300 F.3d 27, 35 (1st Cir. 2002). The petitioner does not appear to challenge the SJC's factual findings and in any event has not presented clear and convincing evidence to rebut the presumption that the SJC's factual findings are correct. The Court accordingly presumes the facts to be correct.

the defendant and by the tested samples
would be found in a random individual was
one in at least 430 million.

The evidence reexamined by police also
included a pair of underwear found on the
ground about five or six feet away from the
victim's body.  DNA matching the victim's
DNA was found on the underwear.  No sperm
cells were detected on them.

The defendant was living and working in
Boston at the time of the victim's death. By
2008, when the case was again being
investigated, he was living in Atlanta,
Georgia.  Boston police detectives traveled
to Atlanta in late 2008 to arrest the
defendant. After he was arrested and brought
back to Boston, the defendant said to a
detective, "I have to face the music now."

At trial, the theory of the defense was that
the defendant had had consensual sex with
the victim prior to her death, but that he
was not her killer.  The defendant sought to
introduce evidence suggesting that the
victim might have been killed by third
parties or that the police investigation had
been lacking.  The judge excluded much,
though not all, of this evidence.

The victim's sister and the victim's friend
and former neighbor testified that they had
never heard of the defendant and that the
victim had never been with older men or with
men who did not speak Spanish.  The victim's
sister also testified that the victim had
been at home during the nights of the week
of Christmas, 1984, including the night
before the victim was killed; and that, on
the day of the killing, the victim had left
home early in the morning and had worked
until 6 p.m.

A police criminologist, Kevin Kosiorek,
opined that the sperm found in the victim's
body had been deposited there around the

time of her death and at the location where
she was discovered. This opinion was based,
in part, on the fact that no sperm cells
were detected on the victim's underwear;
according to Kosiorek, "if somebody is up
walking around, semen would be draining out
of her and would be on the underwear if she
were wearing it...."  Kosiorek also stated
that the pattern of stains found on the
victim's skirt was "consistent with drainage
if a person were laying horizontally."

Kosiorek provided the opinion that sperm
"heads," which were identified in this case,
are usually detectible only within "a day or
maybe a little more" after sexual
intercourse.  In addition, while only small
quantities of sperm and seminal fluid were
collected, Kosiorek explained that the
amounts collected are not indicative of the
amounts actually deposited, and that the
amounts deposited are, in any event, poor
indicators of the timing of intercourse.

*Commonwealth v. Scott*, 470 Mass. 320, 321-323 (2014) (internal

citations and alternations omitted).

### B. <u>State Court Proceedings</u>

In 2008, the petitioner was indicted on one count of

murder.  He was convicted in October 2010 following a jury trial

and sentenced to life in prison.  He appealed.  On December 26,

2014, the SJC affirmed the petitioner's conviction.

*Commonwealth v. Scott*, 470 Mass. 320 (2014).

### C. <u>Relevant Procedural Background</u>

On April 2, 2012, the petitioner initiated this federal

matter by filing a petition for habeas relief.  The petition

attacks his conviction, based upon three, separate alleged due

4

process violations.  It alleges that:  (1) there was insufficient evidence to support a murder conviction; (2) the exclusion of third party culprit evidence deprived the defendant of a meaningful opportunity to present a complete defense; and (3) in light of the trial court's exclusion of third party culprit evidence, the prosecutor's argument in his closing that the victim was without enemies rendered the trial unfair.  (Dkt. Nos. 1, 38).

On June 12, 2015, the respondent filed an answer.  The petitioner thereafter moved to amend his petition to add a fourth theory of relief.  The new argument asserts that the petitioner's Sixth Amendment rights were violated when a juror was discharged and replaced with an alternate, and the trial judge instructed that the new juror was to be "brought up to speed."  (Dkt. Nos. 37-38).  On May 25, 2016, the respondent submitted an opposition to both the habeas petition and the motion to amend.  (Dkt. No. 47).

### III. THE HABEAS PETITION

#### A. Standard of Review

"Federal habeas is not an ordinary error-correcting writ." *Nadworny v. Fair*, 872 F.2d 1093, 1096 (1st Cir. 1989).  It "exists to rescue those in custody from the failure to apply federal rights, correctly or at all."  *Id.*  Habeas relief is only available if a prisoner "is in custody in violation of the

Constitution or laws or treaties of the United States."
*Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (internal
quotations and citations omitted). A writ of habeas corpus thus
"does not lie for errors of state law." *Estelle v. McGuire*, 502
U.S. 62, 67 (1991).

A federal court may grant a writ of habeas corpus only if
the underlying state court adjudication:

> (1) resulted in a decision that was contrary
> to, or involved an unreasonable application
> of, clearly established Federal law, as
> determined by the Supreme Court of the
> United States; or (2) resulted in a decision
> that was based on an unreasonable
> determination of the facts in light of the
> evidence presented in the State court
> proceeding.

28 U.S.C. § 2254(d) (as amended by the Antiterrorism and
Effective Death Penalty Act of 1996 (AEDPA)). Here, the
petitioner does not argue that the trial court unreasonably
determined the facts. This Court's task, therefore, is to
"determine what arguments or theories supported the state
court's decision," and then determine whether "those arguments
or theories are inconsistent with the *holding* in a prior
decision of [the Supreme] Court." *Wetzel v. Lambert*, 565 U.S.
520, 524 (2012) (emphasis added) (quoting *Harrington v. Richter*,
562 U.S. 86 (2011)). *See also Howes v. Fields*, 565 U.S. 499,
505 (2012) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)
("In this context, 'clearly established law' signifies 'the

holdings, as opposed to the dicta'" of the Supreme Court
decisions.)).

In habeas cases, "a state court is afforded deference and
latitude." *Hensley v. Roden*, 755 F.3d 724, 731 (1st Cir. 2014)
(citation omitted). A state court decision is "contrary" to
clearly established federal law only where "the state court
applies a rule different from the governing law set forth in
[Supreme Court] cases, or if it decides a case differently than
[the Supreme Court has] done on a set of materially
indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694
(2002). A decision is an "unreasonable application" of federal
law where "the state court correctly identifies the governing
legal principle from [the Supreme Court] decisions but
unreasonably applies it to the facts of the particular case."
*Id*. The magnitude of the error "must be great enough to make
the decision unreasonable in the independent and objective
judgment of the federal court." *Brown v. Ruane*, 630 F.3d 62, 67
(1st Cir. 2011) (quoting *McCambridge v. Hall*, 303 F.3d 24, 36
(1st Cir. 2002)).

Even assuming that this Court were to find that the state
court committed an error, habeas relief is only appropriate if
the error had "a substantial and injurious effect or influence
in determining the jury's verdict." *Brecht v. Abrahamson*, 507
U.S. 619, 637-38 (1993). In other words, habeas relief cannot

be granted for "harmless" errors, which are defined as those errors that did not impact the verdict.

Applying these principles to this case, the Court discerns no error in the SJC's consideration and adjudication of the petitioner's claims.

### B. Sufficiency of the Evidence

The petitioner argues that the evidence adduced at his trial was insufficient to support his conviction for first-degree murder. In his view, the evidence established only that he had sexual relations with the victim before her death, but did not establish that he killed the victim. The question for this Court is whether the SJC's decision regarding the sufficiency of the evidence was reasonable.

The SJC analyzed this claim as follows:

> Our inquiry is whether, after viewing the evidence in the light most favorable to the Commonwealth, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. The evidence and the inferences permitted to be drawn therefrom must be of sufficient force to bring minds of ordinary intelligence and sagacity to the persuasion of guilt beyond a reasonable doubt. Circumstantial evidence alone may suffice. The evidence in this case satisfies these requirements.
>
> As detailed, the evidence was not limited to the fact that sperm cells matching the defendant's DNA were found in the victim's body and on her clothing. The pattern of sperm on the victim's skirt, and the absence of sperm on the victim's underwear,

indicated that the sperm had been deposited around the time of the victim's death and at the location where her body was discovered. The people closest to the victim, namely her sister and her friend and former neighbor, testified that they had never heard of the defendant and that the victim had never been with older men or with men who did not speak Spanish. The victim's sister also testified to the victim's whereabouts on the day of her death and on the preceding nights. All of these pieces of evidence tended to negate the possibility that the defendant had had sex with the victim on some prior occasion unrelated to her death. Finally, the defendant stated to a police officer, after he was arrested, that he had "to face the music now."

Minds of ordinary intelligence and sagacity, could find this evidence sufficiently forceful to establish beyond a reasonable doubt that the defendant had killed the victim deliberately, upon a reflective decision to do so; that the killing involved the infliction of injuries brutal both in number and in severity; and that it was carried out in the course of the felony of aggravated rape. The evidence was therefore sufficient to support the verdict of guilty on all three theories of murder in the first degree.

*Scott*, 470 Mass. at 324 (internal citations and quotation marks omitted).

Habeas relief based upon insufficient evidence is "reserved for unusual cases and its standard is 'rarely met where there is plausible evidence to support a verdict.'" *Sivo v. Wall*, 644 F.3d 46, 50 (1st Cir. 2011). A habeas court that is assessing whether the evidence at trial was sufficient to support a

conviction must ask "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1990). The Court must draw all reasonable inferences from the evidence in favor of the prosecution and resolve all credibility determinations in favor of the verdict. *Morgan v. Dickhaut*, 677 F.3d 39, 47 (1st Cir. 2012) (citing *United States v. Andujar*, 49 F.3d 16, 20 (1st Cir. 1995)). This is the standard that the SJC applied when it followed *Commonwealth v. Latimore*, 378 Mass. 671 (1979), a state case that adopted the holding of *Jackson*. *Scott*, 470 Mass. 324 (citing *Latimore* and *Commonwealth v. Woods*, 466 Mass. 707 (2014)).

In Massachusetts, first-degree murder is a killing "committed with deliberately premeditated malice aforethought, or with extreme atrocity or cruelty, or in the commission or attempted commission of a crime punishable with death or imprisonment for life." M.G.L. c. 265, § 1.4. These elements may be proven through circumstantial evidence. *See Magraw v. Roden*, 743 F.3d 1, 6-7 (1st Cir. 2014) (affirming denial of habeas relief based upon sufficiency of evidence where petitioner was physically able to commit the murder, had motive, had access to the victim's home and the timeline suggested that the petitioner was the last person to see the victim alive).

The evidence supporting the petitioner's conviction under all three theories included that: 1) sperm cells matching the defendant's DNA were found in the victim's body and on her clothing; 2) the pattern of sperm on the victim's skirt, and the absence of sperm on the victim's underwear, indicated that the sperm had been deposited around the time of the victim's death and at the location where her body was discovered; 3) testimony that friends and family had never heard of the defendant and that the victim had never been with older men or with men who did not speak Spanish; 4) the victim's whereabouts in the days leading up to her death were accounted for such that it would have been highly unlikely that she could have met up with the defendant for consensual sex in that time period; and 5) the petitioner's statement to the police when arrested that he had to "to face the music now."  The petitioner argues, incorrectly, that the SJC's decision rested solely on three of these pieces: the sperm pattern evidence, friend and family testimony regarding the victim's relationship history, and the petitioner's "face the music" statement.  He offers an interpretation of two of the pieces of evidence that is favorable to him, and then argues that the remaining piece of evidence (the sperm pattern evidence) only supports the conviction if "multiple suppositions" are piled "on top of each other."  (Dkt. No. 38).

But this argument misapprehends the Court's role at the habeas stage.  A habeas court reviewing a sufficiency claim "may not freely reweigh competing inferences but must accept those reasonable inferences that are most compatible with the jury's verdict."  *Housen v. Gelb*, 744 F.3d 221, 226 (1st Cir. 2014).  For example, the Court agrees that one plausible explanation for the fact that the victim's family had never heard of the petitioner is that the victim was having a secret, consensual relationship with him.  However, the Court is constrained at this stage to adopt the equally plausible explanation most compatible with the jury's verdict: that the victim's friends and family had never heard of the petitioner because he was a stranger to the victim.  The Court has no trouble concluding that a reasonable fact finder could have found the petitioner guilty of first degree murder beyond a reasonable doubt when all of the evidence against the petitioner is considered, including the particularly compelling evidence, ignored by the petitioner, that the victim would have had scarcely any opportunity for a secret rendezvous with the petitioner in the days leading up to her death.

The Court acknowledges that the state's case against the petitioner was a circumstantial one that required the jury to draw inferences from the evidence.  That does not provide a basis to attack the verdict.  As the First Circuit explained,

12

"virtually by definition, any circumstantial evidence case requires some level of conjecture. 'But a conjecture consistent with the evidence becomes less and less a conjecture, and moves gradually toward proof, as alternative innocent explanations are discarded or made less likely.'" *Magraw*, 743 F.3d at 7 (citing *Stewart v. Coalter*, 48 F.3d 610, 615-16 (1st Cir. 1995)).

## C. **Third-Party Culprit Evidence**

The petitioner next argues that the exclusion of alleged third-party culprit evidence violated his due process rights. Specifically, the petitioner contests the exclusion of three police reports that contained statements from the victim's mother and unverified statements regarding the victim's friend and boyfriend.

The factual basis for this claim, taken from the SJC decision, is as follows:

> As stated, the defendant sought to present evidence suggesting, in his view, that the victim might have been killed by third parties, and that the police had conducted an inadequate investigation. The focal point of this evidence was a set of police reports found in the files of a Boston police detective, Frank Mulvey, who had been involved in the original investigation. Mulvey had died by the time of trial.
>
> The most detailed police report in Mulvey's file (first report) related the following account, provided in its entirety by the victim's mother, speaking through an interpreter. In October, 1984, police searched the apartment of one of the

victim's friends, a woman named Yvonne.
Drugs and cash that belonged to the victim's
former boyfriend, who was known as Chulo,
were hidden in an adjacent apartment, and
police did not find them.  The victim and
Yvonne falsely told Chulo that the drugs and
the cash had been confiscated.  Yvonne used
the money to buy a car. Chulo subsequently
threatened the victim at gunpoint, and she
"told him the whole story."  Chulo set the
car bought by Yvonne on fire.  The first
report also included another, apparently
unrelated piece of information provided by
the victim's mother: the mother reportedly
stated that the victim had told her, shortly
before her death, that she "had been present
in the Jamaica Plain section of Boston when
an African-American guy had been shot in the
head."

Two other police reports contained in
Mulvey's file were far less informative.
According to one (second report), a police
sergeant had received "information that
Yvonne had some Dominicans do the victim
because she thought that she ratted on a
drug deal." According to the other (third
report), police officers had relayed
"information they heard on the street" that
police should "look into" Chulo, who was
"not carrying a full load."

The judge did not permit the defendant to
enter these police reports in evidence,
stating that "there's no indicia sufficient
... for the court to determine their
reliability."  The judge also excluded
certain questions that defense counsel
wished to ask witnesses about the reports.
Specifically, counsel was not permitted to
ask Yvonne's sister whether Yvonne had been
involved with drugs; and in his cross-
examination of the police detective who had
reopened the investigation, Juan Torres,
counsel was not permitted to discuss the
substance of the police reports.  In
addition, the judge denied the defendant's

request for a jury instruction concerning
alleged inadequacies in the police
investigation, although the defendant was
permitted to make arguments about this
matter in closing.

*Scott*, 470 Mass. at 325-26 (internal alteration marks omitted).

The SJC analyzed the petitioner's claim as follows:

A defendant may introduce evidence that
tends to show that another person committed
the crime or had the motive, intent, and
opportunity to commit it.  We have given
wide latitude to the admission of relevant
evidence that a person other than the
defendant may have committed the crime
charged.  If the evidence is of substantial
probative value, and will not tend to
prejudice or confuse, all doubt should be
resolved in favor of admissibility.
We have imposed two types of restrictions on
the admission of third-party culprit
evidence.  First, in order to be admitted,
third-party culprit evidence must have a
rational tendency to prove the issue the
defense raises, and it cannot be too remote
or speculative.  In addition, third-party
culprit evidence is often hearsay, namely
out-of-court statements offered for the
truth of the matter asserted—that a third
party is the true culprit.  Such evidence
may be admitted only if, in the judge's
discretion, the evidence is otherwise
relevant, will not tend to prejudice or
confuse the jury, and there are other
substantial connecting links to the crime.

The opportunity to present third-party
culprit evidence is of constitutional
dimension, because it is rooted in the right
of criminal defendants to a meaningful
opportunity to present a complete defense.
Accordingly, we examine a judge's decision
to exclude third-party culprit evidence
independently, under a standard higher than
that of abuse of discretion.

15

Examining the exclusion of the proffered third-party culprit evidence independently, we are satisfied that there was no error. To begin with, even had it not been hearsay, the evidence offered by the defendant was "remote" and "speculative."  In other words, for the following reasons, this evidence was limited in both reliability and relevance.

The second report and the third report were patently unreliable.  The information in these reports was vague; the second report relayed unspecified "information" that Yvonne "had some Dominicans do" the victim, and all that the third report suggested was that police "should look into" Chulo, who was "not carrying a full load."  In addition, the basis for the vague information in these reports was unclear: the second report was written as a result of a telephone call from a police sergeant who said he "had information," without specifying the source of it; and the information in the third report was "heard on the street."

The first report, which originated from an interview with the victim's mother, was more detailed.  However, the basis of the mother's information was specified only as far as the statement that the victim had witnessed an unidentified African–American man being shot in Jamaica Plain; the mother reportedly had heard of this incident from the victim herself.  The first report did not explain how the mother had learned that the victim and Yvonne had stolen drugs from Chulo, that Chulo had subsequently threatened the victim with a gun, or that he had burnt Yvonne's car.

Moreover, the judge permitted the defendant to conduct a *voir dire* of the mother during trial.  The mother testified at *voir dire* that she did not remember "anything" about speaking to police after her daughter's

death, and that she did not remember her
daughter telling her about stealing drugs
from Chulo, being threatened at gunpoint, or
seeing an African-American man shot in
Jamaica Plain. Instead of illuminating the
first report, the *voir dire* of the mother
thus rendered that report even more
enigmatic.

The first report also was not probative of
the crux of a third-party culprit defense,
namely that another person committed the
crime or had the motive, intent, and
opportunity to commit it. The report
implied that Yvonne, Chulo, or both might
have believed that the victim had wronged
them. It would be a stretch to say that
such beliefs amounted to a "motive" for
murder, particularly since the first report
did not reveal when exactly Chulo was said
to have threatened the victim or to have
burnt Yvonne's car. In any event, the first
report provides no indication that either
Yvonne or Chulo had an intent or an
opportunity to kill the victim, or that they
did, in fact, commit the crime. Evidence of
a third party's ill will or possible motive
is insufficient alone to support a defense
under the third-party culprit doctrine.

Thus, it would have been permissible for the
judge to conclude that the evidence
proffered by the defendant was "too remote
or speculative" to be admitted, even if it
had not been hearsay.

Moreover, as hearsay, both the police
reports and the questioning about them were
admissible as third-party culprit evidence
only if, in the judge's discretion, the
evidence is otherwise relevant, will not
tend to prejudice or confuse the jury, and
there are other substantial connecting links
to the crime. For reasons similar to those
previously discussed, the evidence offered
in this case did not satisfy these
requirements.

The defendant identified no "connecting links" between Yvonne or Chulo and the crime itself, in terms of actual intent to harm the victim, geographical or chronological proximity to the crime scene, or the like. Even the first police report, the most informative of the three, suggested only a speculative and uncorroborated potential motive for the murder. The evidence proffered by the defendant also did not satisfy the requirement of not tending to prejudice or confuse the jury." The defendant wished to share with the jury police officers' notes about vague information from unclear sources. This evidence would have invited the jury to mistake the memorialization of uncorroborated leads for known facts about events preceding the murder. It would have tended, like all third-party culprit evidence, to divert jurors' attention away from the defendant on trial and onto the third party. No less problematically, it would have posed a risk of drawing the jury into an evaluation, irrelevant under the circumstances, of the victim's lifestyle and character. We conclude, therefore, that the judge's exclusion of the evidence proffered by the defendant as third-party culprit evidence was not error.

*Scott*, 470 Mass. at 328-29 (internal quotations marks and citations omitted).

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (Sixth Amendment prohibited state from blanket bar on

evidence of means by which a confession was obtained) (citations and quotations omitted). The Supreme Court, however, has made clear that a "defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions," including those motivated by a state's "legitimate interest in ensuring that reliable evidence is presented to the trier of fact in a criminal trial." *United States v. Scheffer*, 523 U.S. 303, 308-09 (1998). The Court has further explained that rules excluding evidence from a criminal trial do not violate the Constitution "so long as they are not arbitrary or disproportionate to the purposes they are designed to serve." *Id.* at 308 (quotations omitted); *see Crane*, 476 U.S. at 689-90 (noting that Constitution allows "wide latitude to exclude evidence that is repetitive, only marginally relevant, or poses an undue risk of harassment, prejudice, or confusion of the issues").

In *Holmes v. South Carolina*, 547 U.S. 319 (2006), the Court applied these principles in the context of third-party culprit evidence. There, the Court reversed a conviction that was obtained after a state court judge applied a state evidentiary rule to exclude third-party culprit evidence based upon only the strength of the prosecutor's case, without consideration of its probative value or potential adverse effects. *Id*. at 329-30. The Court noted that rules like South Carolina's, which "serve

no legitimate purpose or that are disproportionate to the ends that they are asserted to promote," stand on far different constitutional footing than "well-established rules of evidence [that] permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." *Id.* at 326. Trial court determinations regarding whether certain evidence should be excluded as unreliable are accorded deference. *Brown*, 630 F.3d at 72 (noting "the generality of the right [to present a defense] and the substantial element of judgment required of trial courts in excluding defense evidence"); *see also United States v. Reeder*, 170 F.3d 93, 108 (1st Cir. 1999) (no "unfettered" Sixth Amendment right "to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence" (quotation omitted)).

Here, the SJC reasonably concluded that the three excluded police reports were speculative and lacked necessary foundational information. For example, the source for the second and third reports was information "heard on [the] street." *Id*. at 328. The first report, although more detailed, suffered from similar problems. The report did not detail how the source, the victim's mother, had learned that her daughter and Yvonne had stolen drugs from Chulo or that Chulo burnt

Yvonne's car. *Id.* When questioned during *voir dire*, the mother

testified that she did not remember anything about speaking to

the police and did not remember her daughter telling her about

stealing the drugs, being threatened by Chulo with a gun, or

seeing the shooting in Jamaica Plain. *Id.*

The SJC also reasonably concluded that the excluded

evidence was not probative on the key question in third-party

culprit defense - whether someone else killed the victim. The

SJC reasoned, correctly, that even if the report suggested

Yvonne and Chulo thought the victim wronged them, it still did

not explain how those feelings would provide the motive to kill

the victim. *Scott*, 470 Mass. at 328. This is especially so

given that the report did not provide the timing of Chulo's

alleged threat or burning of Yvonne's car or provide any

evidence that Yvonne or Chulo had the opportunity or intent to

kill, or actually did kill, the victim. *Id.* Accordingly, even

ignoring the hearsay issues with the reports, the SJC was well

within reasonable bounds to conclude that the evidence was too

remote or speculative.

The petitioner argues that his inability to establish the

third-party culprit evidence fit within the requirements of

Massachusetts evidence law should be excused due to the elapsed

time between the murder and the trial. However, he does not

point to any cases holding that the passage of time, standing

alone, changes the required showing for admissibility of third-party culprit evidence.  It may be that reasonable minds can differ on how to handle evidence in a cold case trial, but the Court cannot conclude here that the SJC's determination on this issue was unreasonable under the AEDPA's deferential standard.

### D. **Prosecutor's Statements During Closing Argument**

Finally, the petitioner asserts that his due process rights were violated when the prosecutor stated during his closing argument that the victim was "without enemies" given that the Court, on the prosecutor's motion, had excluded third party culprit evidence suggesting that the victim did have enemies.

The SJC described the factual basis for this claim as follows: "The defendant . . . focuses on the fact that, after successfully requesting that the judge exclude the defendant's proffered third-party culprit evidence, the prosecutor pointed out that no evidence of that type had been presented." *Scott*, 470 Mass. at 333-34.  In particular, the prosecutor made the following arguments:

> There's nothing about [the victim's] life
> that would give anybody who knew her a
> motive to kill her. It is a rape/murder by a
> stranger.
>
> You know from her life she's a regular
> [eighteen] year old living a regular
> [eighteen] year old's life. She was not
> making risky choices. She does not have
> risky friends. She is not engaging in risky
> behavior....

> So when she walked that night ..., she was
> walking as an innocent young woman. A woman
> without enemies. A woman without people who
> would have a motive to kill her. A woman who
> had done nothing herself to cause this.

*Id.* at 334.

The SJC noted that the petitioner had not objected to this argument at trial, but went on to apply an additional layer of review for a substantial likelihood of a miscarriage of justice. *Id.* at 334. The SJC reasoned as follows:

> These comments, and especially the
> prosecutor's statements that the victim "was
> not making risky choices" and was "not
> engaging in risky behavior," would not have
> seemed plausible had the defendant's
> proffered third-party culprit and Bowden
> evidence been admitted. In this sense, the
> prosecutor's argument exploited the absence
> of evidence that had been excluded at his
> request.

> We conclude, however, that there is no
> substantial likelihood that a miscarriage of
> justice occurred. In *Commonwealth v.
> Harris*, supra, we stated: "In determining
> whether an error in closing argument
> requires reversal, we consider whether
> defense counsel made a timely objection;
> whether the judge's instructions mitigated
> the error; whether the error was central to
> the issues at trial or concerned only
> collateral matters; whether the jury would
> be able to sort out any excessive claims or
> hyperbole; and whether the Commonwealth's
> case was so strong that the error would
> cause no prejudice."

> Consideration of these factors, and
> particularly the degree to which the error

was "central to the issues at trial" and the
strength of the Commonwealth's case, leads
us to conclude that reversal is not
required.  First, the prosecutor's remarks
concerning the victim's lack of "risky
behavior" were not a key element of his
closing argument.  Unlike the prosecutor in
*Commonwealth v. Haraldstad*, 16 Mass. App.
Ct. at 568, the prosecutor here did not
extensively "mine the vein" created by the
excluded testimony.  His argument focused on
the evidence that the defendant's sperm was
found in the victim's body and on her
clothing; that the pattern of the sperm
indicated, according to the Commonwealth's
expert, that it had been deposited
approximately when and where the victim had
died; and that, according to the individuals
closest to the victim, she had never been
with older men or with men who did not speak
Spanish.  The prosecutor also devoted much
of his argument to countering the
defendant's efforts to minimize the
prosecution's case, and to recounting the
brutality of the murder.

In addition, the jury heard some evidence
that tended to support the prosecutor's
characterization of the victim's past.  The
victim's sister testified that the victim
did not go out often, at least with her; and
a friend of the victim testified that the
victim "seemed to take care of herself.  She
used to dress like any young girl, you know,
and she used to be clean.  She used to keep
to herself, I think."
In the circumstances, the prosecutor's
misguided remarks did not undermine the
fundamental fairness of the trial.

*Id*. at 334-35.

Subject to certain limited exceptions, federal habeas

review of a claim is precluded when a state court has decided

that claim on the basis of an adequate and independent state-law

ground that is firmly established and regularly followed. *Coleman v. Thompson*, 501 U.S. 722, 729 (1991); *Harris v. Reed*, 489 U.S. 255, 262 (1989).  One common example of an adequate and independent state law ground for a decision is when "a state court decline[s] to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." *Coleman*, 501 U.S. at 729-30.  The First Circuit "[has] held, with a regularity bordering on the monotonous, that the Massachusetts requirement for contemporaneous objections is an independent and adequate state procedural ground, firmly established in the state's jurisprudence and regularly followed in its courts." *Janosky v. St. Amand*, 594 F.3d 39, 44 (1st Cir. 2010) (citations omitted); *see also Horton v. Allen*, 370 F.3d 75, 80-81 (1st Cir. 2004) ("The SJC consistently enforces the rule that unpreserved claims are forfeited, and enforced the rule in the instant case.  The SJC did review the claim for a 'substantial miscarriage of justice,' but this sort of limited review does not work a waiver of the contemporaneous objection requirement.").

In cases where the adequate-and-independent-ground rule applies, "federal habeas review of the claim[ ] is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claim[ ] will result

in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at
750.  Here, there is apparently no dispute that the petitioner's
trial counsel failed to object to the prosecutor's closing
argument.  The petitioner does not argue that he did object.
Indeed, he does not address the issue at all.  As a result, the
petitioner does not advance a cause and prejudice or a
fundamental miscarriage of justice argument that would excuse
the failure to object.  The Court therefore cannot look beyond
the procedural bar.  *See Hodge v. Mendonsa*, 739 F.3d 34, 43 (1st
Cir. 2013) (concluding procedural default bar applicable where
petitioner "ma[de] no attempt to show 'cause' and 'actual
prejudice' on appeal" and did not "specifically argue that
'failure to consider the claim[ ] will result in a fundamental
miscarriage of justice'") (citing *Coleman*, 501 U.S. at 750).

Even if the Court were to reach the merits, the
petitioner's claim fares no better.  The SJC found that the
prosecutor's comments, while inappropriate, did not undermine
the fundamental fairness of the trial.  This conclusion was
consistent with federal law.  That the prosecutor made
statements that were inappropriate or even worthy of
condemnation does not necessarily mean that the petitioner's due
process rights were violated.  *See e.g., Darden v. Wainwright*,
477 U.S. 168, 180, n.11, & n.12 (1986) (habeas relief not
appropriate despite a number of inappropriate prosecutorial

remarks including referring to the defendant as an "animal" and stating "I wish I could see [the defendant] with no face, blown away by a shotgun"). Prosecutorial comments violate the Constitution only if they "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Parker v. Matthews*, 132 S. Ct. 2148, 2153-55 (2012) (quoting *Darden*, 477 U.S. at 181). Factors to weigh when determining whether prosecutorial statements undermined the fairness of the trial include: '"(1) the severity of the misconduct; (2) the context in which it occurred; (3) whether the judge gave any curative instructions and the likely effect of such instructions; and (4) the strength of the evidence against the defendant.'" *Pasteur v. Bergeron*, 581 F. Supp. 2d 130, 142 (D. Mass. 2008) (quoting *United States v. Rodriguez-De Jesus*, 202 F.3d 482, 485 (1st Cir. 2000)).

The SJC correctly applied this standard here. Its decision affirming the conviction rests primarily on the context in which the improper statements were made and the strength of the Commonwealth's case. As the SJC recognized, the prosecutor's closing argument focused on the strength of the evidence that actually was presented, including the sperm pattern evidence and the testimony of the victim's family and friends as to her whereabouts and lack of history dating older men or men who did not speak Spanish. Considered in that context, the prosecutor's

statements that the victim was without enemies, did not engage in risky behavior and must have been murdered by a stranger were regrettable, but they did not render the trial fundamentally unfair.

**IV.   THE MOTION TO AMEND**

The petitioner has moved to amend his petition to include a claim that his Sixth Amendment right to a jury trial was violated by the trial judge's instructions to the reconstituted jury after one of the original jurors was discharged.  The petitioner raised this issue before the SJC, which described its factual basis as follows:

> The judge provided such instructions in this case, stating: "Once we have a new deliberating juror ... you must start your deliberations all over again. I appreciate you have not been deliberating for long, but you must start anew because you now constitute a new jury of twelve deliberating jurors. And you must all start from the beginning so that everyone can hear and share and discuss this case anew . . . .
>
> "Let me repeat, ladies and gentlemen of the new deliberating jury, you are to start your deliberations anew, afresh, start over again . . . ."
>
> [Discussing a question that had been submitted by the jury the prior day, the] judge said:
>
> "There was a note that was given to me by the deliberating jury with a question. I answered that question. The note and the question are with the jury and should be shared with our new juror as well so he is

> up to speed on communications that our
> deliberating jury has had with the court."

*Scott*, 470 Mass. at 336-37. The petitioner proposes to argue that the instruction that the new juror should be "up to speed" invited the 11 jurors who had previously been deliberating to share the contents of their prior deliberations with the new juror. This, the petitioner argues, amounts to an unconstitutional outside influence on the jury. (Dkt. No. 38).

Amendments to habeas petitions are governed by Federal Rule of Civil Procedure 15(a). *See* 28 U.S.C. § 2242 (habeas petition "may be amended or supplemented as provided in the rules of procedure applicable to civil actions). Because the petitioner's motion to amend was made outside the time period for amendment as a matter of course, amendment requires either "the opposing party's written consent or the court's leave." FED. R. CIV. P. 15(a)(2). Rule 15 directs that the Court "should freely give leave when justice so requires." *Id*. Here, the government argues that the motion to amend should be denied because amendment would be futile. Having reviewed the proposed amendment, the Court agrees that the proposed new claim ultimately fails on the merits. However, given the importance of the issue and the petitioner's apparent good faith in seeking leave to raise it, the Court believes that the better course of

action would be to grant the petitioner's motion to amend and then address the claim directly.

Proceeding accordingly, the claim is unavailing here, for at least three reasons. First, the claim is barred from habeas review because Scott did not object to the court's instruction at trial. *Scott*, 470 Mass. at 336. As discussed, a petitioner who does not make a contemporaneous objection to a trial court ruling waives the objection on appeal, and a state court finding that such a waiver occurred is an adequate and independent state law ground supporting the state court decision, rendering the claim unreviewable in the habeas context. *Janosky*, 594 F.3d at 44.

Second, the fact that there is no clearly established Supreme Court holding on point addressing this issue precludes habeas relief. *See Brown*, 630 F.3d at 68 (the fact that no Supreme Court cases squarely address a particular issue is dispositive in habeas cases because "[s]tate courts are entitled to resolve an open question in Supreme Court jurisprudence without triggering federal court review under AEDPA"). Further, it bears noting in that regard that two circuit courts have considered and rejected the argument that the failure to instruct a jury to deliberate anew when a substitute juror is added violates the Sixth Amendment. *See Tate v. Bock*, 271 F.

App'x 520 (6th Cir. 2008); *Hernandez v. Janda*, 576 F. App'x 706, 707 (9th Cir. 2014).

Finally, and as the SJC recognized, the jury in this case actually was instructed to begin deliberations anew when a juror substitution was made. The Court agrees that, in context, the instruction that the new juror be brought up to speed was not an invitation to rehash prior deliberations. Rather, the trial judge was instructing the jury to share with the new juror a specific juror question and related answer. Thus, even assuming that the petitioner had a Sixth Amendment right to an instruction that deliberations must begin anew when juror substitutions are made, that right was not violated here.

**V.   CONCLUSION**

For the foregoing reasons, it is recommended that the petitioner's motion to amend (Dkt. No. 37) be GRANTED. It is further recommended that the petitioner's habeas petition as amended, (Dkt. No. 1), be DENIED. The parties are hereby advised that under the provisions of Federal Rule of Civil Procedure 72(b), any party who objects to this recommendation must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such

objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See *Keating v. Secretary of Health and Human Servs.*, 848 F.2d 271 (1st Cir. 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *United States v. Vega*, 678 F.2d 376, 378-379 (1st Cir. 1982); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); see also *Thomas v. Arn*, 474 U.S. 140 (1985).

/s/ Donald L. Cabell
DONALD L. CABELL, U.S.M.J.